**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**CAPITAL EQUIPMENT, INC.,**                                                      **PLAINTIFFS**
**an Arkansas Corporation; TEXAS**
**TIMBERJACK, INC., a Texas Corporation;**
**and NOBLE EQUIPMENT, LLC, A Nevada**
**Limited Liability Company**

**v.**                                **NO. 4:04-CV-00381 GTE**

**CNH AMERICA, LLC, Successor in Interest to**
**NEW HOLLAND NORTH AMERICA, INC.,**
**a Delaware Corporation, d/b/a**
**NEW HOLLAND CONSTRUCTION**                                                       **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT**
**AS TO CAPITAL EQUIPMENT, INC. AND RULING ON DAUBERT ISSUES**

Before the Court is a Motion for Summary Judgment filed by Defendant CNH America, LLC d/b/a New Holland Construction (hereinafter referred to as "NHC"), against Plaintiff Capital Equipment, Inc. ("Capital"). Capital has responded to the motion. Following a review of the entire summary judgment record, the Court concludes that Defendant's motion must be granted in part and denied in part. The motion is granted with respect to Capital's claims for violation of the Arkansas Unfair Practices Act; tortuous interference with business advantage; violation of the Uniform Commercial Code in connection with open price terms; promissory estoppel; and violation of the Robinson-Patman Act. As to all of these claims, Capital conceded summary judgment. NHC's summary judgment motion is denied with respect to all other claims, but the Court discusses herein several legal issues posed by the remaining claims.

The Court declines on the current record to strike the testimony of Plaintiffs' damage expert, Mr. Leiber. The Court finds that on balance, Defendant's objections go to the weight of

- 1 -

Mr. Leiber's testimony rather than admissibility. This decision is necessarily a judgment call and the Court will not hesitate to revisit the issue at trial in the context of an actual factual record and a further review of applicable law.

## BACKGROUND AND FACTUAL OVERVIEW

The Court will not repeat in detail the background facts or procedural history of this case. Such is revealed in the voluminous record, which includes several substantive Orders and the transcript from a Daubert hearing, *to-wit*:

(1) Order of September 27, 2004, denying NHC's motions to dismiss and taking under advisement personal jurisdiction issue as to claims against Plaintiffs Noble and Timberjack (Docket no. 27);

(2) Order Finding Personal Jurisdiction, dated January 11, 2005 (Docket No. 31);

(3) Order denying Plaintiffs' Motion for Partial Summary Judgment, dated January 6, 2006 (Docket No. 73);

(4) Order Regarding Defendant's Daubert Challenge, dated January 9, 2006 (Docket No. 75);

(5) Daubert Hearing held on January 25, 2006. Transcript of Hearing filed as Docket No. 109).

In their latest motions, the parties present vastly different views of the record evidence. The Court cannot resolve at summary judgment the multiple factual disputes presented thereby. While the Plaintiff Capital's theories and evidence presented in support would arguably permit a jury finding in its favor on the remaining claims, there are several threshold legal issues, issues which, if resolved adversely to Capital, would greatly diminish (or possibly even eliminate) its theory of damages. Although the Court, on the current record, concludes that it may not rule

NHC's favor at this time on any of the disputed claims, it discusses the claims herein for the purpose of alerting the parties to the legal issues the Court will be considering at trial. The Court invites the parties to offer any additional legal support for their respective legal theories following receipt and review of this Order.[1]

After conceding summary judgment on certain claims, Capital asserts that a trial is required as to at least four its remaining claims. It describes those claims as follows in its summary judgment response:

(1) NHC violated the AFPA, Ark. Code Ann. § 4-72-206(6) by acting in a manner that is commercially unreasonable; and such actions resulted in a de facto termination, in violation of Ark. Code Ann. § 4-72-204(a)(1);

(2) NHC violated the fraud provisions of the AFPA, Ark. Code Ann. § 4-72-207(a)(3);

(3) NHC's auction sales breached the parties' written agreement;

(4) NHC violated the Arkansas Farm Equipment Retailer Franchise Protection Act ("AFERFPA").

Plaintiff Capital complains primarily about the following four categories of conduct taken by NHC, conduct which Capital contends could be found by the jury to be either commercially unreasonable or taken in the absence of good-faith:[2]

(a) evidence requiring that Capital participate in a "market builder" program, whereby Capital was required to order machines assuming a 10% market share, for machines that had 0% market share at the time that they were ordered (thereby contributing to a significant overstock situation at Capital);

---

[1] The Court did not require the parties to file trial briefs, in view of the pending motions.

[2] The Courts views the summary judgment evidence and inferences therefrom in a light most favorable to Plaintiff Capital, as it must at this stage of the litigation. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986).

- 3 -

(b) providing product that was of substandard quality (thereby making it difficult or impossible to sell, particularly the large pieces of NHC equipment);

(c) after placing Capital in such a precarious financial position (putting it both in an overstock situation with product that was virtually impossible to sell), NHC surreptitiously began selling new and unused products indirectly to end users, by designating Ritchie Bros. as a national account and then allowing product that was consigned to Ritchie Bros. to be sold a prices significantly lower than Capital's dealer cost, fully aware of the fact that it was Ritchie Bros.'s advertised intent to set a "global market" for these machines through the auction; and,

(d) after Capital got to the point where it could not proceed in carrying the heavy pieces of NHC's machinery, New Holland concluded its commercially-unreasonable conduct by not allowing Capital, one of its top 10 skid steer and TLB [tractor loader backhoes] dealers in the United States for several years running, to continue to sell this product, based on the claim that it was against NHC's policy to allow dealers of "small products" only (e.g. skid steers and TLBs) to coexist in markets where it had a large full-line dealer – when in fact, New Holland has dozens of such arrangements throughout the United States.

(Capital's Response Brief at p. 11).

Douglas Meyer, Capital's President and sole shareholder, contends that he was contemplating becoming a Hyundai dealer when he was contacted by NHC executive, John Trueman. According to Mr. Meyer, Mr. Trueman pointed to the fact that Hyundai was auctioning new and unused equipment through an auction house as evidence of Hyundai's severe financial distress. Mr. Meyer further contends that Mr. Trueman promised that NHC would not engage in this sort of conduct (e.g., auctioning of new equipment). Mr. Meyer asserts that based on this representation, he decided to forego the relationship with Hyundai and to enter into the contract with NHC. (Meyer Affidavit, Exh. 10 to Capital's Response, Docket No. 106).

Again, this brief (and incomplete) overview of Capital's claims and factual theories is provided solely for the purpose of framing the legal issues discussed below.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when, in reviewing the evidence in the light most

- 4 -

favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## DISCUSSION

This case would make a good law school or bar exam question; it poses a myriad of legal issues. Because the Court finds that it will benefit from a full development of the facts at trial, it declines to make final rulings on any disputed <u>claims</u>, but it offers the following as indications of its tentative views. The Court further requests the parties to file trial briefs (the filing of which was previously excused) by May 8, 2006. NHC's summary judgment motion was understandably somewhat of a shotgun approach. The Court now requests that the parties follow up with more focused briefing on the remaining legal and evidentiary issues.

The following is not intended to provide an exhaustive discussion of each and every issue raised by NHC, but rather to highlight selected issues.

### I. CAPITAL'S BREACH OF CONTRACT CLAIM BASED ON AUCTION SALES

NHC contends that its selling equipment through an auction house, Ritchie Brothers, did not violate the contract between the parties as a matter of law. The Court addressed the flip side of this argument when it rejected Capital's contention that such actions violated the contract as a matter of law. (See Court's Order Denying Partial Summary Judgment, Docket No. 73). In its

prior Order, the Court found the contract language in question was "not so clear and unambiguous" to permit a ruling as a matter of law. (*Id*. at 6). The Court also expressed doubt as to the construction urged by the Plaintiff dealers, noting that it was "arguably contrary to the agreement's intent as a whole." (*Id*. at 5).

When the contract is read in a vacuum, it appears that NHC has the better argument on this point. Capital argues strenuously that paragraph 4(f) of the Dealer Agreement, which permits "direct sales to end users" creates a contract ambiguity. Were the Court to rule on this issue at this time, it would hold that the auction sales action did not violate the specific terms of the contract, for the reasons stated in its prior Order and argued capably by the Defendant NHC in its motion papers in support of summary judgment. However, the Court elects not to make a final ruling at this time. It might possibly consider additional evidence and certainly it would welcome additional argument regarding the meaning of the contract in light of the parties' understanding. There is arguably some ambiguity in the contract on this point, particularly in light of alleged discussions between the parties regarding auction sales and Capital's allegation that NHC represented that it would not sell new and unused equipment in such a fashion. Arguably, Capital's understanding and reliance on such the alleged oral represenation would not be inconsistent with or contrary to the plain language of the contract.

Of course, if the auction sales were unambiguously permitted by the contract, then the Court would have to consider whether the parol evidence rule would prohibit the introduction of any extrinsic evidence to contradict or vary the express terms of the contract. NHC argues the parol evidence rule prohibits such testimony. The Court's preliminary and tentative view is that extrinsic evidence concerning such sales might not be precluded by the parol evidence rule. Generally, under Arkansas law, the parol evidence rule "requires exclusion of evidence that adds

- 6 -

to or varies an unambiguous written contract." *TCBY Systems, Inc. v. RSP Co., Inc.*, 33 F.3d 925, 929 (8th Cir. 1994). Here, however, the term "direct sales" in paragraph 4(b) of the Dealership Agreement is, at least, arguably ambiguous.

Additionally, even if the auction sales did not violate the letter of the parties' written agreement, could not such sales still be found by the jury to be a violation of the Arkansas Franchise Practices Act? Arguably, they could. Thus, in waiting to issue a final ruling on this point, the Court is mindful that little, if any trial time, will be saved by a pre-trial legal ruling. Because Capital is entitled to pursue recovery for the same conduct under its AFPA claims, the auction sales evidence is likely to be presented to the jury regardless of the Court's ruling on the breach of contract claim.

Capital has elected to use a lost profits damage model which is based on the assumption that Capital lost the entire NHC line and profits it would have realized therefrom as a result of NHC's auction sales. Apparently, Capital has no evidence that the auction sales resulted in any specific lost sales, although it offers testimony, through its owner, about the negative impact on its ability to sell NHC equipment and argues that such impact was caused, at least in part, by the the auction sales, which had a depressive effect on the price and market for the NHC line nationwide. NHC argues that the absence of evidence of specific lost sales is fatal to a damage recovery on Capital's breach of contract claim. Whether such decline in profits can fairly be attributed, in whole or in part, to the auction sales remains to be seen. It seems unlikely that Capital can prevail on the theory that the auction sales alone rose to the level of causing its foreseeable collapse and de facto termination. And, how is the jury to delineate between NHC's auction sales, which may have been in breach of the contract, and NHC's other actions which Capital argues contributed to the collapse of its business but which were not in breach of the

- 7 -

contract? Finally, should Capital be precluded by virtue of the contractual damage limitation from recovering lost profits for the alleged contract breach? That topic is the subject of the next section.

The Court requests additional briefing on all of these topics (as well as others the parties may identify) in the requested trial briefs.

## II.     EFFECT OF THE DEALER AGREEMENT'S LIMITATION OF DAMAGES ON BREACH OF CONTRACT AND AFPA CLAIMS

NHC argues that its liability is limited as a matter of law to those damages suffered between the date of the notice of termination and the effective termination of Capital's dealership. The Dealership Agreement contains a "limitation of liability" provision, which states in pertinent part:

> This Agreement contemplates that the Dealer, as an independent business, shall purchase PRODUCTS for resale in conformity with the provisions of this Agreement, and shall obtain on its own the capital investment necessary to operate the business. Nothing in this Agreement shall impose any liability on New Holland Construction in connection with the Dealer's operations under this Agreement or otherwise, or for any expenditure made or incurred by the Dealer in preparation for performance or in performance of the Dealer's responsibilities under this Agreement.
>
> The Dealer and New Holland Construction both understand and agree that this Agreement is of a limited duration, and therefore, except as provided herein, neither party is entitled to any compensation or reimbursement for **loss of prospective profits**, anticipated sales or other losses **occasioned by expiration, cancellation, non-renewal or termination**. More specifically, the damages to which either party may be entitled are limited to those which occur, or which are incurred, during the period of time between notice of cancellation, non-renewal or termination and the effective date thereof.

(Dealer Agreement, at ¶ 27)(emphasis added).

The Dealer Agreement is also limited in duration to successive one-year terms and

- 8 -

permits either party to terminate the Agreement, with or without cause, with 90 days' notice.[3] (Dealer Agreement, at ¶¶ 21-22). Finally, the Dealer Agreement provides, in a provision entitled: "Duration" that Capital was not relying "on any representation regarding the continuation of this Agreement or its benefits beyond the initial term or any subsequent term." (Dealership Agreement at 14, 19).

NHC contends that the Dealership Agreement's disclaimer of lost profits and damages upon termination beyond the ninety day period following termination is valid and enforceable under Arkansas law. While NHC does not treat separately the effect of the contractual limitations provision on Capital's breach of contract claim and its effect on its statutory claims, the Court notes that it is necessary to treat Capital's claims as separate and distinct. Additionally, it is clear that a franchisor's action (or inaction) may be in conformity with its contractual obligations yet still violate the AFPA. *See Miller Brewing Co. v. Roleson*, __ S.W.3d __, 2006 WL 137218 (Ark. Sup. Ct. Jan. 19, 2006)(discussing *Southern Implement, Inc. v. Deere & Co.*, 122 F.3d 503 (8th Cir. 1997)). With that in mind, the Court will consider the effect of the contract disclaimer.

### Disclaimer's Effect on AFPA Claims

Generally speaking, parties may contract to limit their liability. Arkansas law specifically provides that the recovery of consequential damages for breach of contract may be "limited or excluded" unless the limitation is unconscionable. Ark. Code Ann. § 4-2-719 (Repl. 2001). However, "a party cannot waive liability imposed by statutory provisions that are intended to protect both an individual and the public because to do so would be contrary to public policy." *Voicestream Wireless Corp. v. U.S. Communications, Inc.*, 912 So.2d 34 (Fla. App. 2005).

---

[3] This provision is in direct conflict with the AFPA. *See* discussion *infra*.

The Arkansas legislature enacted the AFPA for the protection of franchisees conducting business within the state of Arkansas. The statute, enacted in 1977, includes an emergency clause which reads in pertinent part:

> The Legislature finds and declares that distribution and sale of franchise agreements in the State of Arkansas vitally affects the general economy of the State, public interest and public welfare; . . . and that some franchisors have, without good cause and to the great prejudice and harm of the citizens of the State of Arkansas, cancelled existing franchise agreements and that other such cancellations are threatened, and that only by the immediate passage of this Act can this situation be remedied and it is therefore necessary in the public interest to define the relationship and responsibilities of franchisors and franchisees in connection with franchise agreements. Therefore, an emergency is declared to exist and this Act being necessary for the preservation of public peace, health and safety, shall be in full force and effect from and after its passage and approval.

(Emergency Clause to Act 355 of 1977).

The AFPA was obviously enacted for the protection of the public. This Court, in other litigation, has found that the AFPA represents a <u>fundamental</u> public policy of the state of Arkansas. *See Britelink, Inc. v. Telecorp PCS, Inc., Eastern District of Arkansas Case,* No. 3:03-CV-207 GTE, Order of May 7, 2004, Docket No. 26). Clearly, NHC is the party with superior bargaining power and Capital the party for whose benefit the AFPA was enacted.

The Court concludes that the Arkansas General Assembly's statutory enactment of protections for franchisees in the AFPA reflect fundamental public policy decisions. Those protections may not be displaced by the franchisor securing contractual agreements to avoid or limit NHC's liability under the AFPA.

The Court's conclusion, based upon a public policy analysis, is further bolstered by the AFPA itself. The statute contains a provision stating that it shall be a violation for a franchisor "to engage directly or indirectly in [the practice] . . . of requir[ing] a franchisee at the time of entering into a franchise arrangement to assent to a release, assignment, novation, waiver, or estoppel which would relieve any person from liability imposed by this subchapter." Ark. Code

Ann. § 4-72-206(1). Clearly, NHC could not have used the contract to require Capital to release its statutory claims under the AFPA.

With regard to Plaintiff's claims under the Franchise Practices Act, the Court finds that the contract limitation of damages provision is inapplicable (and therefore unenforceable) to the extent that such provisions limit the statutory protections afforded Capital under the AFPA. Thus, to the extent lost profits are available to Capital under the AFPA, Capital may recover such damages notwithstanding the contractual limitation on damages.[4]

### Disclaimer's Effect on Breach of Contract Claim

Contractual provisions limiting damages are strictly construed against the party invoking their protection. Howard Brill, ARKANSAS PRACTICE SERIES: LAW OF DAMAGES, § 17:17 (5th Ed. 2004). Arkansas law requires that such contractual limitations of liability be phrased in "clear and unmistakable language." *Gramling v. Baltz*, 253 Ark. 361, 485 S.W.2d 183 (1972). The limitation by its terms is restricted to lost profits and other damages "occasioned by expiration, cancellation, non-renewal or termination." Read literally, it does not apply to losses occasioned by other causes, such as contract breaches or violations of the AFPA. Capital seizes on the narrow language of the provision to argue that it can avoid the damage limitation because it seeks damages only for a contract breach.

Admittedly, the limitation provision in this case is not as broad as that contained in some

---

[4] The Court recognizes that this holding arguably conflicts with a case relied upon by NHC, *Great Earth Intern. Franchising Corp. v. Milks Development*, 311 F.Supp. 2d 419 (S.D.N.Y. 2004). This Court is not bound, of course, by a district court case from New York. *Great Earth* includes no discussion of New York's Franchise Act, whether it represented fundamental public policy, or whether it was appropriate for the franchisor to contract to avoid application of the statute. It simply interpreted the damage provision to be broad enough to preclude any recovery of lost profits without distinguishing between the plaintiff's various theories. The Court does not find the case to be helpful.

of the other cases relied upon by NHC. *See, e.g., Cryogenic Equipment, Inc. v. Southern Nitrogen, Inc.*, 490 F.2d 696, 697-98 (8th Cir. 1974)(applying Arkansas law)(enforcing limitation provision which provided: "In no event shall [the contractor] be liable for anticipated profits, consequential damages or loss of use of the equipment or of any installation into which the equipment may be put" and finding the limitation sufficiently clear, not misleading, and noting the "complete absence of any evidence of a disparity in bargaining power").

Still, the provision is clearly intended to preclude recovery of lost profits arising from the termination or cancellation of the Agreement. And, Capital's damage model is necessarily predicated on damages for an alleged "de facto termination." Capital argues, on one hand, that it can avoid the damage limitation because it seeks damages only for a contract breach, rather than a termination, while simultaneously seeking to recover under a damage model that is valid only if NHC's contract breach caused Capital's foreseeable collapse or de facto termination.

To the extent that Capital is permitted to submit a breach of contract claim to the jury, *see* discussion *supra*, it may well be appropriate to deny lost profits under a breach of contract theory. Again, the Court prefers to make this decision on the basis of a fully developed factual record at trial.

### III.    **CAPITAL'S CLAIMS UNDER THE AFPA**

Capital alleges that the following conduct by NHC violated the Arkansas Franchise Practices Act, Ark. Code Ann. § 4-72-201 et seq. (2001)("AFPA") in the following ways: (1) by refusing to deal with Capital in a commercially reasonable manner and in good faith; (2) by cancelling Capital's dealership without good cause; (3) by perpetrating fraud and misrepresentation upon Capital; and (4) by failing to repurchase Capital's inventory upon termination. NHC urges the Court to find in its favor on each of Capital's theory of recovery

under the AFPA.

Because Capital has come forward with evidence which, if believed, will permit a jury finding in its favor, the Court denies summary judgment as to AFPA's claims. The Court does find it necessary, however, to discuss two legal issues raised by NHC's theories for recovery.

**De Facto or Constructive Termination**

NHC argues that Capital cannot prevail on its theory that it was terminated without good cause in violation of the AFPA because it voluntarily resigned its dealership and was not terminated. Capital urges this Court to reject this theory, to predict that Arkansas courts would recognize constructive or de facto terminations as violating the AFPA's good cause requirement for terminating a franchisor, and to find the evidence sufficient to permit such a finding.

It is undisputed that Capital on October 9, 2001, wrote a letter to NHC advising that it had suffered "enormous financial hardships as a result of New Holland Construction" and asserting that the financial difficulties were the result of "being overstocked and unable to move the NHC products." (Exh. R to Capital's Response). In the same letter, Capital advised that it was resigning the NHC line but wished to continue selling the "skids [skid steer loaders] and TLB's." NHC contends that Capital abandoned the line.[5] Capital contends that NHC's actions caused the financial ruin of its company and should be considered a de facto termination.

No Arkansas case addresses the issue of whether a franchisee may pursue an action for termination when the termination is constructive rather than actual. Other jurisdictions, construing similar state franchise protection acts, have recognized de facto or constructive

---

[5] If this were so, Capital would still have a claim for NHC's refusal to permit Capital to continue selling skid steer loaders and TLB's.

- 13 -

termination claims.[6] The Second Circuit, in electing to do so, reasoned that "[i]f the protections of the Connecticut legislature afforded to franchisees were brought into play only by a formal termination, those protections would quickly become illusory. We think it reasonable therefore to believe it was the legislature's aim to have the umbrella of the Acts's protection cover constructive as well as formal termination. To hold otherwise would allow franchisors to accomplish indirectly that which they are prohibited from doing directly." *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1182 (2nd Cir. 1995).

While the Court might predict that Arkansas courts, if confronted with the issue, would conclude that a franchisor may not indirectly bring about the termination of its franchisee, it would first like to consider the issue in terms of the big picture. Under what circumstances would a franchisor's actions rise to the level of constructive or de facto termination? How would such protections be reconciled with the AFPA's other provisions?

The *Petereit* court, in considering how to determine when a franchisee had been constructively terminated, had this to say:

> . . . it appears that something greater than a de minimis loss of revenue – and less than the stark scenario of driving a franchisee out of business – must be shown in order to justify a finding of constructive termination. We think such may be found when a franchisor's actions result in a substantial decline in franchsee net income. Such analysis will be strictly financial, except in close cases, where non-financial factors may have some bearing. Whether a decline in net income is substantial will necessarily depend on the particular facts and must be determined on a case-by-case basis.

*Petereit*, 63 F.3d at 1183 (emphasis in original).

The parties have focused their arguments more on whether Arkansas courts would recognize a constructive or de facto termination. But, even if this Court should conclude that the

---

[6] *See, e.g.*, cases cited by Capital in brief opposing summary judgment, Docket no. 106, at pp. 17-18.

Arkansas courts would recognize constructive termination, many questions remain – for example, how would such a theory work within the AFPA's framework; what would the contours of such a claim be; what would Capital be required to prove to prevail; and what would additional remedies would arise, if any, by virtue of proving a constructive termination?  The Court invites additional briefing from the parties on these issues.

In particular, the Court is curious to know whether there is authority for the proposition that before a franchisor may be held liable for a constructive termination it must have committed acts which could be found by the jury to constitute violations of the AFPA independently of the alleged de facto termination.  The AFPA permits recovery for actual damages for a franchisor's refusal "to deal with a franchise in a commercially reasonable manner and in good faith." Ark. Code Ann. § 4-72-206.  The Arkansas Supreme Court's most recent discussion of the AFPA suggests that many actions taken by a franchisor – even if such actions are not a violation of a franchisor's contractual obligations – may be found by the jury to be commercially unreasonable and therefore in violation of the AFPA. *Miller Brewing Co. v. Roleson, supra*.  Capital has alleged numerous other acts which it contends violated the AFPA.  Given the breadth of the AFPA, should it not be the law to require Capital to prevail on at least one of its non-termination claims under the AFPA before permitting a finding of constructive termination?  If this is a correct interpretation of the law, then a constructive termination claim could not arise absent an independent violation of the AFPA.

As to what Capital would be required in order to prevail, should we look, by analogy, to constructive discharge claims in the context of employment discrimination?  If so, should not Capital be required to prove either that NHC acted with the intent of forcing Capital to resign its dealership or that Capital's resignation was a reasonably foreseeable result of NHC's actions,

AND that a reasonable dealer in Capital's situation would have deemed resignation the only reasonable alternative. *See, e.g.*, 8TH CIR. CIVIL JURY INSTRUCTIONS 5.93 (2005).

Finally, since Capital is entitled to recover actual damages for any actions deemed by the jury to be commercially unreasonable, if such actions caused Capital's demise and can form the basis for a lost profits recovery as Capital's "actual damages" then what does a claim for constructive termination add to the mix? In other words, under what circumstances, if any, may Capital recover the lost profits measure of damages as "actual damages" under the AFPA, despite the fact that it resigned its NHC dealership? Is it necessary to demonstrate a constructive termination in order to recover lost profits, assuming Capital prevails on its other theories (excluding the fraud based theories) that NHC violated the AFPA? If not, is it not arguably the case that the only claim for relief under the AFPA that appears to be contingent on Capital's ability to prove a constructive termination under the AFPA is the claim for repurchase of its inventory?[7] Finally, since Capital only resigned the heavy equipment portion of the line and intended and desired to continue selling skid steer loaders and TLB's (and allegedly was told it could do so as it did prior to taking on the heavy construction line at NHC's suggestion), was it not arguably "terminated" from continuing to carry that line? Capital will apparently argue that NHC's "all-or-none" approach was itself an AFPA violation, independently of the constructive termination issue.

As the above discussion shows, whether to recognize a claim for constructive termination

---

[7] NHC complied with the repurchase obligations included in Arkansas' Farm Equipment Retailer Franchise Protection Act, but that Act only required NHC to repurchase Capital's new, unused, and undamaged equipment. Ark. Code Ann. § 4-72-307. The AFPA's repurchase provisions appear broader, and arguably trigger the obligation to repurchase all inventory, including used equipment, but only upon the termination of a franchise without good cause. Ark. Code Ann. § 4-72-209.

- 16 -

is not a decision that can or should be made in a vacuum, i.e., without due consideration given to the AFPA as a whole.

The Court requests additional consideration and briefing from the parties on these issues.

**AFPA Fraud Claim**

Finally, the Court notes with regard to Capital's claim under the AFPA that NHC committed fraud by advising it when it signed up that it would not engage in auctions, that a serious issue exists concerning whether such a promise regarding a future act could qualify as fraud. In that connection, the Court notes a potential issue with regard to Capital's proof.

The AFPA contains a fraud provision which makes it unlawful for a franchisor to "directly or indirectly, in connection with the offer of any franchise . . . to knowingly . . . make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." Ark. Code Ann. § 4-72-207(a)(2). The same provision of the statute also makes it unlawful to "engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person." Ark. Code Ann. § 4-72-207(a)(3).

The Court cannot resolve on this summary judgment record the factual disputes regarding what NHC agent Mr. Trueman actually told Capital owner Doug Meyer regarding whether NHC would sell new and unused product at auction. Assuming that he made such a representation, is there any evidence that NHC's agent had any reason to believe – at that time – that NHC would engage in auction sales in the future? Or, was that simply his belief at the time? Or, was Mr. Meyer simply indicating that NHC's competitor was in financial trouble and pointing to its auction sales as proof of same? If so, such comments would arguably be "puffing" or "sales talk." Normally, such comments do not rise to the level of actionable fraud.

A serious issue exists with regard to whether the alleged statements regarding auction sales can form the basis for an actionable fraud claim.  NHC focused more on the factual, rather than the legal aspect of the issue, in its summary judgment motion.  To the extent that Capital intends to go forward on a fraud claim related to the pre-contract statements regarding the auction sales, the Court would like the parties to address this issue further.

### IV.    DAUBERT ISSUES

The Court's preliminary view is that NHC's objections to the expert damage testimony of Mr. Leiber go to the weight of his testimony rather than its admissibility.  The Court takes under advisement NHC's objection to the lost profits calculation for a period of ten years.  The Court's preliminary veiw is that NHC's argument is more meritorious with reference to the claims for lost profits in connection with the heavy equipment construction line.  Capital had been selling the smaller skid steer loaders and TLB's for many years, and successfully so.  Capital did not have the same history with respect to the heavy equipment construction line and it might well be appropriate to limit lost profits in connection with that line.  NHC's expert should be prepared to trim his lost profits damage calculations, if requested to do so, and to do so in a manner which differentiates between the skid steer loaders and TLB's as opposed to the remaining NHC line.

The Court also requests that the parties consider whether this case might be appropriate for bifurcation with liability tried in Phase I and damages in Phase II.  Such an approach has the advantage of avoiding a taint on the entire verdict if the Court is wrong about its *Daubert* holding.  The Court intends to explore this issue further with the parties in the pre-trial conference.

### V.    PRE-TRIAL CONFERENCE

The Court would like to conduct a pre-trial conference in this case.  A pre-trial

conference is tentatively scheduled for **Monday, May 15, 2006**.  The Court's tentative plan is to begin making the jury on Tuesday, May 16, 2006.  The Court has set aside two weeks for the trial of this case, but believes it should not last that long.

## CONCLUSION

For the reasons herein stated,

IT IS THEREFORE ORDERED THAT Defendant New Holland Construction's Motion for Summary Judgment Against Plaintiff Capital Equipment, Inc. (Docket No. 91) be, and it is hereby GRANTED IN PART AND DENIED IN PART, as stated herein.

IT IS FURTHER ORDERED THAT Defendant New Holland Construction's Motions to Exclude Plaintiffs' Expert Damage Testimony (Docket Nos. 60 & 62) be, and they are hereby, DENIED without prejudice to renew said objections at trial.

IT IS FURTHER ORDERED THAT Plaintiffs' Motion for Extension of Time (Docket No. 87) be, and it is hereby, GRANTED, nunc pro tunc.

IT IS FURTHER ORDERED, on the Court's own initiative, that the parties are directed to file simultaneous Trial Briefs responding to the legal issues raised herein and detailing any other issues likely to arise at trial.  Said briefs shall be due by 2:00 p.m. on **Monday, May 8, 2006.**  Response briefs may be filed not later than 2:00 p.m. on **Thursday, May 11, 20006.**

IT IS FURTHER ORDERED, on the Court's own initiative, that the parties are directed to appear on **Monday, May 15, 2006**, at 9:30 a.m. for a pre-trial conference.  The Court will, time permitting, discuss and resolve outstanding evidentiary, legal or other issues, pre-admit agreed exhibits, and take up and consider objections to exhibits and/or witnesses.   Prior to said conference, the parties are directed to confer for the purpose of discussing their respective

witness and exhibit lists, pre-marking agreed exhibits,[8] and hopefully, narrowing their objections. The parties are further directed to bring to the Court's attention any other issues that need to be addressed during the pre-trial conference.

    IT IS SO ORDERED this   28th   day of April, 2006.

                                              /s/Garnett Thomas Eisele
                                          UNITED STATES DISTRICT COURT

---

[8] Since this is likely to be a document intensive case, the Court would appreciate, to the extent possible, avoiding duplication of exhibits. The Court requests the parties to prepare and use an Agreed set of Trial Exhibits in addition to Plaintiff and Defendant Exhibits.